## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

HAROLD JOSEPHS,
an individual,

       *Plaintiff*,

vs.

SIGMA-ALDRICH CORPORATION,
a Delaware corporation,

       *Defendant*.

HONORABLE_____

CIVIL ACTION NO. _____

MARK A. CANTOR       (P32661)
ROBERT C.J. TUTTLE    (P25222)
JOHN E. NEMAZI      (P33285)
**BROOKS KUSHMAN P.C.**
1000 Town Center
Twenty-Second Floor
Southfield, Michigan  48075
Tel:    (248) 358-4400
Fax:   (248) 358-3351

      *Attorneys for Plaintiff*

## <u>COMPLAINT FOR FALSE PATENT MARKING</u>



## I.  <u>THE PARTIES</u>

1.      Plaintiff, Harold Josephs, Ph.D., P.E., is a licensed professional engineer residing in this judicial district.

2.      Defendant, Sigma-Aldrich Corporation (hereafter "Sigma"), is a Delaware corporation, having a principal place of business at 3050 Spruce Street, St. Louis, Missouri 63103.

3.      Sigma has appointed National Registered Agents, Inc. located at 712 Abbot Road, East Lansing Michigan, 48823, as its registered agent for service of process.



## II.  <u>JURISDICTION</u>

4.       The federal claim pleaded herein arises under 35 U.S.C. §292(b).

5.       Subject matter jurisdiction for this federal claim is conferred upon the Court by 28 U.S.C. § 1338(a).



## III.  BACKGROUND FACTS

**A.**      **The Purpose of this Action**

6.      The purpose of this lawsuit is to act in the public interest to enforce the policy underlying the false marking statute,  35 U.S.C. §292.

**B.**      **The Policy of the Patent Marking Statutes**

7.      The patent marking statute (35 U.S.C. §287(a)) and the false patent marking statute (35 U.S.C. §292) exist to insure that the public has accurate information on the existence of patent rights in articles.

8.      The several purposes of the patent marking statute were explained by the Federal Circuit in *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1443 (Fed. Cir. 1998), as: (1) helping to avoid innocent infringement, (2) encouraging patentees to give notice to the public that the article is patented, and (3) aiding the public to identify whether an article is patented.

9.      In the event a patentee (or its licensee) fails to comply with the marking requirement of 35 U.S.C. §287(a), the sanction is that "no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice."

10.      When the Patent Act of 1952 was enacted, false patent marking was punishable as a criminal offense under Title 18 of the United States Code.



11.    The Patent Act of 1952 retained a *qui tam* cause of action on behalf of the public to fine the offender in an amount of up to $500 for each offense, with half going to the use of the United States, and the other half going to the person bringing the action.

12.    P. J. Federico, one of the principal drafters of the Patent Act of 1952, wrote a "Commentary on the New Patent Act," explaining a *qui tam* action under 35 U.S.C. §292:

> Section 292 is divided into two subsections, subsection (a) is written in the same form as the sections of the criminal code (Title 18, U.S.C.A.) establishing criminal offenses and the offense of false marking is now an ordinary criminal offense which can be prosecuted in the same manner as others. However, subsection (b) of section 292 retains the informer (*qui tam*) action as additional, presumably alternative, to the criminal action.

13.    False marking of unpatented articles as "patented" is injurious to the public interest, as explained by the United States Court of Appeals, in at least the following ways:

•    Acts of false marking deter innovation and stifle competition in the marketplace.

•    False marks may deter scientific research when an inventor sees a mark and decides to forgo continued research to avoid possible infringement.

•    False marking can cause unnecessary investment in design around or costs incurred to analyze the validity or enforceability of a patent whose number has been marked upon a product with which a competitor would like to compete.

14.    Additionally, a consumer seeing an article marked as "patented" is likely to infer the article possesses design or utilitarian features that are unique to such article, and not available in substitute articles from other producers, thus inducing consumer demand for the marked article.

-4-



C.     **Federal Patent Policy**

     15.    The Supreme Court stated in *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery*, 324 U.S. 806, 816 (1945), that patents by their very nature are affected with a public interest:

> The possession and assertion of patent rights are 'issues of great moment to the public.' [Citations omitted.] A patent by its very nature is affected with a public interest. As recognized by the Constitution, it is a special privilege designed to serve the public purpose of promoting the 'Progress of Science and useful Arts.' At the same time, a patent is an exception to the general rule against monopolies and to the right to access to a free and open market.

     16.    The United States Patent and Trademark Office agrees: "A patent by its very nature is affected with a public interest." 37 C.F.R. §1.56(a).

     17.    Due to the public's interest in the patent system, Congress has empowered "any person" to file a false marking action in Federal Court under 35 U.S.C. §292, or request reexamination of any claim of an enforceable patent (35 U.S.C. §302 (*ex parte*) and 35 U.S.C. §311 (*inter parte*s)), whether or not the person acting is involved in a substantial controversy with the patentee, or has adverse legal interests to the patentee, or has sustained an injury-in-fact.

     18.    The Supreme Court has stated:

(A)    *"*An unpatentable article, like an article on which the patent has expired, is in the public domain and may be made and sold by whoever chooses to do so. *Sears Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225 (1964); *Compco Corp. v. Day-Brite Lighting*, 376 U.S. 234 (1964),



(B)      "... federal law requires that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent." *Lear, Inc. v. Adkins*, 395 U.S. 653, 668 (1969), and

(C)      "In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying." *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001).

19.      False patent marking is an impediment to these basic federal policies.

**D.      Sigma- A Patent-Sophisticated Company**

20.      Sigma describes itself in its Form 10-K, filed with the Securities and Exchange Commission, as follows:

> The Company is a leading Life Science and High Technology company. The Company develops, manufactures, purchases and distributes the broadest range of high quality chemicals, biochemicals and equipment available throughout the world. These chemical products and kits are used in scientific research, including genomic and proteomic research, biotechnology, pharmaceutical development and as key components in pharmaceutical, diagnostic and other high technology manufacturing. The Company operates in 38 countries, manufacturing approximately 48,000 of the 130,000 chemical products it offers. The Company also offers approximately 40,000 equipment products. The Company sells into over 160 countries, servicing over 92,000 accounts representing over one million individual customers.

21.      Sigma further describes its worldwide patent portfolio in its Form 10-K as follows:

> The Company holds approximately 510 issued or pending patents, over 520 licenses and has approximately 850 registered trademarks and trademark applications worldwide. The Company's significant trademarks are the brand names: "Sigma-Aldrich", "Sigma," "Aldrich," "Fluka," "Riedel-de Haën," "Supelco," "SAFC," "SAFC Biosciences," "SAFC Supply Solutions," "SAFC Pharma," "SAFC Hitech,""Genosys," "Proligo" and "Pharmorphix." The brands are marketed through

-6-



business units called "Research Essentials," "Research Specialties," "Research Biotech," and "SAFC (Fine Chemicals)." Their related registered logos and the significant trademarks are expected to be maintained indefinitely.

The Company is aware of the desirability for patent and trademark protection for its products. The Company believes that other than its brand names, no single patent, license, trademark (or related group of patents, licenses, or trademarks) is material in relation to its business as a whole.

* * * *

Our success and ability to compete is dependent in part on our ability to protect and maintain proprietary rights to our intellectual property, particularly trade secrets and proprietary know-how. We generally enter into confidentiality and proprietary information agreements with our employees, consultants and advisors.

* * * *

Despite efforts to protect our proprietary rights, existing trade secret, copyright, patent and trademark laws afford us only limited protection. Others may attempt to copy or reengineer aspects of our products or obtain and use information that we regard as proprietary. . . . Litigation may be necessary to enforce our intellectual property rights or to determine the validity and scope of the proprietary rights of others. Litigation of this type could result in substantial costs and diversion of resources and could significantly harm our results of operations and reputation.

22.     Sigma is a very patent conscious company and monitors patent expiration. Sigma even posts on its web site a report about patent expiration entitled "Analysis of Drugs Coming Off Patent Using Discovery HS C18 Columns".

23.     Sigma maintains an extensive online catalog of it products providing detailed patent information about each of its products as indicated in its form 10-K report:.

The Company's main marketing vehicles include its website, sigma-aldrich.com, plus printed catalogs in the marketplace for the Sigma, Aldrich, Fluka and Supelco brands. These catalogs are supplemented with advertisements in chemical and other scientific journals, the mailing of special product brochures, the electronic distribution of various advertisements and product data, news releases related to new product offerings and by personal visits by management, sales and technical representatives with customers.

-7-



By these "marketing vehicles," Sigma: (a) transacts business within the State of Michigan, and (b) enters into contracts for materials to be furnished in the State of Michigan, relating to its marked products.

24.    Sigma has a large number of customers with many placing small orders. As a result of the small size of many orders it is not practical to expect customers to independently verify the accuracy of the patent information provided on the Sigma web site.

> During 2009, products were sold to over 92,000 accounts representing over one million individual customers, including universities, pharmaceutical companies, commercial laboratories, industrial companies, non-profit organizations, governmental institutions, biotechnology, diagnostic, chemical and electronics companies and hospitals. Orders in laboratory quantities averaging over $400 accounted for 72%, 72% and 71% of the Company's net sales in 2009, 2008 and 2007, respectively. The Company also makes its chemical products available in larger-scale quantities for use in manufacturing. Sales of these products accounted for 28%, 28% and 29% of net sales in 2009, 2008 and 2007, respectively.

**E.    Sigma's False Marking**

25.    Sigma makes and sells a variety of products which it marks its advertising and product literature with the number of patents which are expired.  Example of products which are falsely marked are sold using the following Sigma brands:

- FLAG
- ANTI-FLAG
- p3XFLAG
- FLAG-2
- REDAccu Taq
- RED Klen Taq
- GenomePlex

26.    An exemplary falsely marked product is **Anti-Azidothymidine antibody produced in rabbit**, which is currently advertised on Sigma's on-line catalog and product



referencing a U.S. patents the full term of which would have expired on October 10, 2008 had it not

lapsed on October 10, 2003 for failure to pay the final maintenance fee:



27.    A second exemplar is **p3XFLAG-CMV™-10 Expression Vector**, which is currently

advertised on Sigma's web site and  product literature as "patented" where the patents are expired:

> The enclosed DNA expression vector and/or antibody are specifically adapted for a
> method of producing selected protein molecules covered by one or more of the
> following patents owned by Sigma-Aldrich, Inc.: U.S. Patent Nos. 4,703,004,
> 4,782,137 and 4,851,341. Your payment includes a limited license under these
> patents to make only the following uses of these products:



28.     A third exemplar is the Sigma **Director-Ready pT7-MAT®-2** , which  is currently advertised on Sigma's web site and  product literature as "patented" where many of the patents have expired:

> These products and/or their use are covered by one or more of the following Sigma patents: US 7,504,238, US 5,011,912, US 4,703,004, US 4,782,137, US 4,851,341...

29.     A forth exemplar is the Sigma **pT7-FLAG™-2 Expression Vector**, which is currently advertised on Sigma's web site and  product literature as "patented" where all four of the cited patents are expired:

> The enclosed DNA expression vector and/or antibody are specifically adapted for a method of producing selected protein molecules covered by one or more of the following patents owned by Sigma-Aldrich Co.: U.S. Patent Nos. 5,011,912, 4,703,004, 4,782,137 and 4,851,341; ... Your payment includes a limited license under these patents to make only the following uses of these products:

30.     A fifth exemplar is the Sigma's **FLAG™-tag Gene human**, which is one of over one hundred FLAG genes currently advertised on Sigma's web site as "patented" when the cited US patent is expired:

> FLAG and its use are covered by one or more of the following patents: US 4,782,137; EP 150126; and JP 1983150.

31.     The above instances of false marking are merely representative and not exhaustive.  There are over 200 products on the Sigma web site which are falsely marked with expired patent numbers.



**F.**     **Sigma's Intent**

32.     Sigma did not have, and could not have had, a reasonable belief that its products were properly marked in light of the extensive pattern of marking expired patent numbers on its product advertising.

33.     Sigma is a patent-sophisticated company that monitors patent expiration. Sigma knew, or should have known, that many of the patents marked on its product advertising in its online catalog had expired.

34.     Sigma knows that for many of its customers making small purchases it is not practical to conduct an independent investigation to verify the accuracy of the patent  information on the Sigma web site and product literature.

**G.**     **Sigma's Liability And Public Harm**

35.     Sigma's extensive pattern false patent marking in its product advertising, coupled with its intended  purpose in deceiving the public, is injurious to the public.

36.     Sigma is liable to the United States and Josephs for false marking under 35 U.S.C. §292 (b).

37.     The public interest requires Sigma be enjoined from further acts of false marking.



## IV.  **DEMAND FOR RELIEF**

WHEREFORE, plaintiff Josephs demands entry of judgment against defendant Sigma granting relief as follows:

A.    A determination that Sigma has violated 35 U.S.C. §292 by falsely indicating in its  advertising that articles are "patented," knowing that the patent has expired, for the purpose of deceiving the public;

B.    An order fining Sigma for false marking of its products in an amount which is reasonable in light of the total revenue and gross profit derived  from the sale of falsely marked goods and the degree of intent to falsely mark which is proven, with half of the fine going to the use of the United States and the other half going to Josephs;

C.    A determination that this case is "exceptional," in the sense of 35 U.S.C. § 285;

D.    An order preliminarily and permanently enjoining Sigma, its officers, agents, servants, employees, contractors,  suppliers and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, from committing new acts of false patent marking and to cease all existing acts of false patent marking within 90 days;

E.    An award in favor of Josephs, and against Sigma, for the costs incurred by Josephs in bringing and maintaining this action, including reasonable attorneys' fees; and



F.      Such other, further, and different relief as may be just and equitable on the proofs.


Respectfully submitted,

**BROOKS KUSHMAN P.C.**


By:  /s/ Robert C.J. Tuttle
MARK A. CANTOR          (P32661)
ROBERT C.J. TUTTLE      (P25222)
JOHN E. NEMAZI          (P33285)
1000 Town Center
Twenty-Second Floor
Southfield, Michigan  48075
Tel:    (248) 358-4400
Fax:    (248) 358-3351
Email: mcantor@brookskushman.com
          rtuttle@brookskushman.com
          jnemazi@brookskushman.com
          *Attorneys for Plaintiff*

Dated: February 16, 2010

-13-

